175 F.3d 1156
 ALUMINUM COMPANY OF AMERICA; Columbia Aluminum Corporation;
Columbia Falls Aluminum Company; Elf Atochem North
America, Inc.; Intalco Aluminum Corporation; Kaiser
Aluminum & Chemical Corporation; Northwest Aluminum
Company; Reynolds Metals Company; and Vanalco, Inc., Petitioners,
v.
ADMINISTRATOR, BONNEVILLE POWER ADMINISTRATION, Respondent.
 No. 95-70480.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Jan. 11, 1999.
Filed May 10, 1999.
 
 James L. Buchal, Murphy & Buchal, Portland, Oregon, for the petitioners.
 Ellen D. Katz, United States Department of Justice, Environment and Natural Resources Division, Washington, D.C., for the respondent.
 Petition to Review a Decision of the Bonneville Power Administration.
 Before: LEAVY, McKEOWN, and WARDLAW, Circuit Judges.
 McKEOWN, Circuit Judge.
 
 
 1
 This proceeding is the latest in a series of cases involving the continuing conflict between salmon and hydropower, "the two great natural resources of the Columbia River Basin." Northwest Resource Info. Ctr., Inc. v. Northwest Power Planning Council, 35 F.3d 1371, 1375 (9th Cir.1994). Salmon, as anadromous fish, hatch in freshwater tributaries, and then travel as juveniles or "smolts" to the ocean, where they reach maturity. As adults, salmon return to their natal streams and lakes to spawn and die. In traveling to and from the Pacific Ocean, the salmon species at issue here[1] must pass through or around[2] dams and reservoirs that are part of the world's largest hydropower system, the Federal Columbia River Power System (the "FCRPS"). The U.S. Army Corps of Engineers (the "Corps") and the U.S. Bureau of Reclamation (the "Bureau") operate the FCRPS. In turn, the Bonneville Power Administration (the "BPA") markets the hydroelectric power generated by the FCRPS.
 
 
 2
 In 1995, the National Marine Fisheries Service ("NMFS") declared that the then proposed FCRPS operations plan would jeopardize the continued existence of the salmon at issue and recommended measures to avoid such jeopardy. On March 10, 1995, the BPA issued a Record of Decision adopting NMFS's suggestions (the "1995 ROD"). In June 1995, several companies that purchase power from the BPA, known as direct service industrial customers (collectively, the "DSIs"), petitioned for review of the 1995 ROD, claiming among other things that the BPA acted arbitrarily, capriciously, or contrary to law in adopting the remedial measures proposed by NMFS. The DSIs also contend that the BPA inappropriately failed to prepare an environmental impact statement. We have jurisdiction pursuant to 16 U.S.C. § 839f(e)(5), and we deny the petition.
 
 I. Background
 
 3
 A. Endangered Species and the Statutory Framework
 
 
 4
 The events giving rise to this dispute began with NMFS's identification in 1991 of Snake River sockeye as an endangered species and NMFS's listing in 1992 of Snake River spring/summer and fall chinook as threatened species.[3] As a result, these salmon species came under the protection of the Endangered Species Act, section 7 of which mandates, in part, that:
 
 
 5
 Each Federal agency shall, in consultation with and with the assistance of the Secretary [of the Interior or Commerce], insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary to be critical....
 
 
 6
 16 U.S.C. § 1536(a)(2). This subsection further provides:
 
 
 7
 In fulfilling the requirements of this paragraph each agency shall use the best scientific and commercial data available.
 
 
 8
 Id. With regard to salmon, the Secretary of Commerce has delegated its authority to NMFS. See 50 C.F.R. § 402.01(b); American Rivers v. National Marine Fisheries Serv., 126 F.3d 1118, 1122 n. 7 (9th Cir.1997).
 
 
 9
 When formal consultation is required under section 7, NMFS, as the "consulting agency," must provide "a written statement ... detailing how the agency action affects the species or its critical habitat" to the federal agency at issue (also referred to as the "action agency"). 16 U.S.C. § 1536(b)(3)(A); see 50 C.F .R. § 402.14 (formal consultation is required if an action might affect a listed species or critical habitat). This written statement is referred to as a Biological Opinion ("BiOp"). If the BiOp concludes that jeopardy or adverse modification exists, NMFS must suggest reasonable and prudent alternatives ("RPAs") that it believes would not violate section 7(a)(2) and that can be implemented by the action agency. 16 U.S.C. § 1536(b)(3)(A). In addition, if NMFS concludes that no jeopardy exists or that RPAs would avoid jeopardy and that the incidental taking of endangered or threatened species will not violate section 7(a)(2), NMFS must issue an Incidental Take Statement specifying the conditions under which incidental taking may occur. 16 U.S.C. § 1536(b)(4).
 
 
 10
 B. Litigation Over Earlier Biological Opinions
 
 
 11
 The competing environmental and economic interests associated with FCRPS operations have spawned years of litigation. The present action follows a series of decisions and BiOps dealing with salmon and FCRPS operations. In 1992, in an effort to assist the downstream migration of juvenile salmon, the Corps and the Bureau increased water flows through the system to augment the velocity of the river and create water spills at the dams. This approach engendered considerable debate as to its efficacy and economics.
 
 
 12
 Following the 1992 decision to increase water flows, several power purchasers, including the DSIs, unsuccessfully challenged two related "no jeopardy" BiOps issued by NMFS. Pacific N.W. Generating Co-op. v. Brown, 38 F.3d 1058 (9th Cir.1994). The DSIs argued that the 1992 BiOps failed to consider the impact of harvesting on the listed species and were not based on the best scientific and commercial evidence. Id. at 1061. While that case was pending, NMFS issued another "no jeopardy" BiOp concerning FCRPS operations for 1993 (the "1993 BiOp"). The district court disapproved of NMFS's 1993 BiOp in Idaho Dep't of Fish & Game v. National Marine Fisheries Serv., 850 F.Supp. 886 (D.Or.1994), vacated as moot, 56 F.3d 1071 (9th Cir.1995).
 
 
 13
 In the meantime, however, NMFS had issued another "no jeopardy" BiOp regarding FCRPS operations for the years 1994 through 1998 (the "1994 BiOp"). The 1994 BiOp contained the same errors the district court had identified in the 1993 BiOp. As a result of the district court's decision in Idaho, NMFS reinitiated consultation and subsequently issued a BiOp for 1995 and future years (the "1995 BiOp"). The 1995 BiOp superseded the 1994 BiOp and is the BiOp at issue here.
 
 
 14
 C. The 1995 Biological Opinion and the BPA's 1995 Record of Decision
 
 
 15
 In contrast to the previous BiOps, the 1995 BiOp concluded that the operation of the FCRPS jeopardizes the continued existence of the listed salmon and adversely modifies their critical habitat. Before reaching this conclusion, NMFS participated in a series of discussions with two groups formed to assist the federal consulting and action agencies in complying with the district court's judgment in Idaho: (i) the Biological Requirements Work Group ("BRWG"), and (ii) the Actions Work Group ("AWG").[4] These groups were composed for the most part of the parties to Idaho, including the BPA. The BRWG and AWG began meeting shortly after the Idaho court issued its decision in the spring of 1994 and continued discussions throughout the summer and fall.
 
 
 16
 In January 1995, following a coordinated effort, NMFS and the U.S. Fish and Wildlife Service (the "FWS") issued separate draft BiOps concerning FCRPS operations, and solicited comments. In February 1995, the BPA, along with several other entities, submitted written comments and participated in meetings regarding the draft BiOps. This joint effort culminated in March 1995 with NMFS's issuance of its final 1995 BiOp, in which it recommended a multi-part RPA for avoiding jeopardy. The RPA consisted of immediate and intermediate/long term actions, including plans for further study.
 
 
 17
 The Corps and the Bureau formally adopted the 1995 BiOp shortly after its issuance. At the same time, the BPA issued the 1995 ROD, documenting its "decision to participate with [the Corps] and [the Bureau] to operate the Federal Columbia River Power System ... for 1995 and future years consistent with these alternatives [suggested by NMFS and the FWS[5]] and the measures in the incidental take statements." The DSIs now petition for review of the BPA's 1995 ROD.
 
 II. Scope and Standard of Review
 
 18
 The DSIs advance arguments targeted at both NMFS's actions in preparing the 1995 BiOp and the BPA's decision to adopt NMFS's "jeopardy" finding and RPA. The former claims, at least as they challenge the analysis of NMFS, which is not a party to this action, are beyond the scope of our review on a petition under 16 U.S.C. § 839f(e)(5). On similar procedural facts, we previously held that attacks on the consulting agency's actions "misse[d] the mark." Pyramid Lake Paiute Tribe of Indians v. United States Dep't of the Navy, 898 F.2d 1410, 1415 (9th Cir.1990). In Pyramid Lake, an Indian tribe challenged a BiOp adopted by the Department of the Navy but issued by the FWS, which was not a party to the action. We refused to consider whether the FWS had in any way violated the Endangered Species Act, stating:
 
 
 19
 The Tribe argues at length that the FWS's biological opinions which contain the "no jeopardy" findings are based on faulty analysis.... The Tribe's argument misses the mark, however, because the FWS is not a party to this action. The FWS's actions, or lack thereof, in preparing its opinions are relevant on appeal only to the extent that they demonstrate whether the Navy's reliance on the reports is "arbitrary and capricious."
 
 
 20
 Id.
 
 
 21
 The DSIs' other challenge, involving the BPA's 1995 ROD, presents a threshold question concerning the extent to which a federal action agency may rely on a consulting agency's finding of jeopardy under the Endangered Species Act. The DSIs urge us to set aside the 1995 ROD on grounds that the BPA should have conducted an independent analysis and concluded that the operation of the FCRPS did not jeopardize the continued existence of the listed salmon. This approach is antithetical to our established standards of review.
 
 
 22
 The Administrative Procedure Act ("APA") governs judicial review of administrative decisions involving the Endangered Species Act. Pyramid Lake, 898 F.2d at 1414. Likewise, the APA applies to judicial review of final actions of the BPA Administrator. 16 U.S .C. § 839f(e)(2). Under the APA, we have authority to "hold unlawful and set aside agency action ... found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Our review under this standard is narrow and we cannot substitute our judgment for that of the agency, particularly when "the challenged decision implicates substantial agency expertise." Mt. Graham Red Squirrel v. Espy, 986 F.2d 1568, 1571 (9th Cir.1993).
 
 
 23
 We have previously addressed situations in which a consulting agency has issued a "no jeopardy" opinion and the action agency has adopted it. Although no bright line emerges from those cases, we have concluded that an action agency may not escape its responsibility under the Endangered Species Act by simply rubber stamping the consulting agency's analysis. See Resources Ltd., Inc. v. Robertson, 35 F.3d 1300, 1304 (9th Cir.1994); Pyramid Lake, 898 F.2d at 1415 ("A federal agency cannot abrogate its responsibility to ensure that its actions will not jeopardize a listed species...."). On the other hand, we have held that an action agency need not undertake a separate, independent analysis in the absence of new information not considered by the consulting agency in reaching its "no jeopardy" conclusion. See Stop H-3 Ass'n v. Dole, 740 F.2d 1442, 1460 (9th Cir.1984). Finally, we have upheld an action agency's adoption of a "no jeopardy" finding even when based on admittedly "weak" best available evidence. See Greenpeace Action v. Franklin, 14 F.3d 1324, 1336 (9th Cir.1993).
 
 
 24
 In contrast, we now face a situation in which the consulting agency has issued a "jeopardy" finding. In considering the nature of our review of the action agency's adoption of the "jeopardy" determination, we are guided by the Supreme Court's decision in Bennett v. Spear, 520 U.S. 154, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). In Bennett, the Court observed that when a consulting agency issues a "jeopardy" opinion, its decision has a "powerful coercive effect." Id. at 169. The Court warned that an action agency disregards a "jeopardy" finding "at its own peril," and bears the burden of articulating in its administrative record the reasons for reaching the opposite result. Id. at 169-70. Acknowledging the expertise of a consulting agency, the Court explained that an action agency "runs a substantial risk if its (inexpert) reasons turn out to be wrong.... for 'any persona' [including an agency employee] who knowingly 'takes' an endangered or threatened species is subject to substantial civil and criminal penalties, including imprisonment." Id. (citing 16 U.S.C. § 1540).
 
 
 25
 In light of the action agency's obligations and risks as underscored by the Supreme Court, we decline the DSIs' invitation to scrutinize the BPA's adoption of NMFS's "jeopardy" finding more critically than we would an action agency's reliance on a consulting agency's "no jeopardy" opinion. To the extent the DSIs seek to impose on the adoption of a "jeopardy" determination a higher evidentiary burden than that applied with respect to a "no jeopardy" finding, such attempt is contrary to the purposes and spirit of the Endangered Species Act. See 16 U.S.C. §§ 1531(a)(3), (b), & (c). Likewise, we will not require that an action agency reinvent the wheel and conduct an independent jeopardy analysis when nothing more is offered than evidence and arguments already considered by the consulting agency. Review under the APA's arbitrary and capricious standard is well developed in our precedent and we see no reason to refine it further here.
 
 III. Review of the BPA's 1995 ROD
 
 26
 The DSIs argue that the 1995 ROD does not pass muster under the APA because the "jeopardy" finding is not supported by appropriate data and is based on a flawed standard. Neither argument has merit. Similarly, the applicable statutes do not support the DSIs' contention that the BPA's adoption of NMFS's suggested RPA contravenes its obligation to provide economical power.
 
 A. The "Jeopardy" Finding and the RPA
 
 27
 We view the DSIs' challenges as reflecting primarily a difference of opinion among experts concerning the cause of the listed species' decline and the appropriate methods for improving their chances for survival. As the BPA itself recognized, "there are different views among scientists regarding what measures are most appropriate to benefit listed salmon." Such disagreement does not establish a lack of adequate foundation for the conclusions reached in the 1995 BiOp or the BPA's decision to adopt it. See Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) ("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive.").
 
 
 28
 While cloaking their challenge in terms of the obligation to use "the best scientific and commercial data available," the DSIs' arguments are essentially an effort to rehash the multi-year scientific debate that culminated in the adoption of the 1995 BiOp. Two examples underscore this point. First, the DSIs express dissatisfaction with the proposal to increase flow, employ spill, and reduce transportation, raising oft-repeated concerns about spill-related disease in the fish, and accusing NMFS of ignoring data demonstrating the efficacy of smolt transportation. Far from disregarding relevant scientific information, however, NMFS engaged in a detailed analysis of these issues and weighed the available data.
 
 
 29
 Second, the DSIs take issue with the choice NMFS made between competing computer models, but again, the DSIs do no more than present a dispute previously resolved by the expert agency. In fact, the DSIs' complaint appears unfounded because NMFS expressly placed "greater weight" on the results of the Columbia River Salmon Passage ("CRiSP") computer model preferred by the DSIs. The BPA separately documented its analysis of the computer modeling and biological data, and ultimately concluded that the CRISP model coupled with another model provided the best available quantitative assessment of the factors affecting juvenile survival and long-term population trends of the listed species.
 
 
 30
 Although the BPA itself quarreled with some of NMFS's conclusions, in the end, the BPA determined that NMFS's overall approach, which emphasized further research and monitoring, was reasonable and responsible. The DSIs now invite us to second-guess the BPA's final decision. We decline to do so. Rather, on this record, which reflects scientific uncertainty and differing scientific views resolved in part by expert choices and in part by commitments for further study, we cannot say the BPA acted arbitrarily, capriciously, or contrary to law in adopting NMFS's "jeopardy" finding[6] or multi-part RPA. See Southwest Ctr. for Biological Diversity v. United States Bureau of Reclamation, 143 F.3d 515, 523 (9th Cir.1998) ("The Secretary was not even required to pick the best alternative or the one that would most effectively protect the [listed species] from jeopardy.").
 
 B. Balancing Economic Interests
 
 31
 The DSIs also assert that the BPA failed to balance appropriately its obligations under the Endangered Species Act against the Northwest Power Act's directive to "assure the Pacific Northwest of an adequate, efficient, economical, and reliable power supply." 16 U.S.C. § 839(2). The Northwest Power Act's goal of providing economical power, however, does not supplant the BPA's obligation to comply with environmental mandates. We previously examined the history of the Northwest Power Act and identified several "innovations" that must enter into the BPA's calculus, including: (i) requiring consistent construction with other statutes "specifically including environmental laws"; (ii) shifting the focus in wildlife mitigation from "merely creating substitute resources, such as salmon hatcheries, to emphasizing changes in hydro project operations"; (iii) lowering the burden of proof for undertaking remedial action by requiring only the "best available scientific knowledge" rather than "scientific certainty"; and (iv) favoring "biological outcomes over economic ones." Northwest Resource, 35 F.3d at 1378.
 
 
 32
 In addition, the DSIs' argument ignores the imperative nature of the Endangered Species Act. See 16 U.S.C. § 1536(a)(2) ("Each Federal agency shall ... insure that any action ... is not likely to jeopardize...." (emphasis added)). Contrary to the DSIs' contention, the BPA cannot disregard its duties under the Endangered Species Act. Given the factors it must weigh, the BPA cannot be said to have struck an improper balance between salmon and economical hydropower.
 
 IV. Environmental Impact Statement
 
 33
 The DSIs contend that the BPA violated the National Environmental Policy Act 5 ("NEPA") by failing to prepare an environmental impact statement ("EIS") before issuing the 1995 ROD.[7] The BPA responds that the final EIS issued by the Corps, the Bureau, and the BPA in November 1995 renders the DSIs' claim moot. The BPA is correct. An action is moot if "no actual or live controversy exists," for example, when we cannot grant effective relief. Cook Inlet Treaty Tribes v. Shalala, 166 F.3d 986, 989 (9th Cir.1999). The DSIs' complaints are stale because a final EIS was prepared and we can grant no relief that would "undo" the operation of the FCRPS during the period between issuance of the 1995 ROD and the final EIS.[8]
 
 
 34
 The petition for review is DENIED.
 
 
 
 [1]
 This case involves Snake River sockeye and Snake River spring/summer and fall chinook, which are subject to protection under the Endangered Species Act of 1973, 16 U.S.C. §§ 1531-1544
 
 
 [2]
 At certain dams, a portion of the juvenile salmon are loaded into tanker trucks or barges equipped with river water circulation systems and transported to a release site downstream
 
 
 [3]
 A species is classified as "endangered" if it is "in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). A species is classified as "threatened" if it is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20). In 1994, the status of spring/summer and fall chinook was changed from threatened to endangered. Ramsey v. Kantor, 96 F.3d 434, 437 n. 1 (9th Cir.1996)
 
 
 [4]
 Several DSIs subsequently brought suit, claiming that the BRWG and AWG were "advisory committees" subject to and acting in violation of the Federal Advisory Committee Act. Aluminum Co. of Am. v. National Marine Fisheries Serv., 92 F.3d 902 (9th Cir.1996). We disagreed, holding that the BRWG and AWG were not groups "formed by, at the prompting of, or solely for" the federal government, but rather were created "for the purpose of aiding compliance with the district court's order." Id. at 905. In the action now before us, the DSIs renew their complaints about the BRWG and AWG. Their arguments about the allegedly secret procedure used for recovery planning are specific to NMFS, which is not a party to this action, and are therefore not properly before us
 
 
 [5]
 The DSIs have raised no issues involving the FWS's BiOp or its adoption by the BPA
 
 
 [6]
 We are unpersuaded by the DSIs' argument that NMFS applied a flawed jeopardy standard. NMFS correctly stated the statutory standard and appropriately considered the effect of future FCRPS operations within the context of other existing human activities that impact the listed species, including incidental harvesting. See 50 C.F.R. § 402.02 ("The environmental baseline includes the past and present impacts of all ... other human activities in the action area...."). In addition, NMFS correctly viewed incremental improvements as insufficient to avoid jeopardy in light of the already vulnerable status of the listed species. We agree with NMFS that the regulatory definition of jeopardy, i.e., an appreciable reduction in the likelihood of both survival and recovery, 50 C.F.R. § 402.02, does not mean that an action agency can "stay the course" just because doing so has been shown slightly less harmful to the listed species than previous operations. Here, the species already stands on the brink of extinction, and the incremental improvements pale in comparison to the requirements for survival and recovery. Finally, we find no fault with the method in which NMFS included in the jeopardy calculus the listed species' potential for recovery
 
 
 [7]
 NEPA mandates that all federal agencies "include in every recommendation or report on proposals for ... major Federal actions significantly affecting the quality of the human environment, a detailed statement ... on the environmental impact of the proposed action." 42 U.S.C. § 4332(2)(C)(i)
 
 
 [8]
 The DSIs assert in their reply brief that their claims are not moot because the alleged problems with an earlier EIS were carried over to the final EIS. The DSIs inappropriately raise a new argument in their reply. See Martinez-Serrano v. INS, 94 F.3d 1256, 1259 (9th Cir.1996), cert. denied, --- U.S. ----, 118 S.Ct. 49, 139 L.Ed.2d 15 (1997)